Our first case this morning is 25-40247, Herod v. Guerrero. Mr. Corcoran. May it please the court. When the lower court granted habeas relief on petitioners Nepu and Brady claims, it made several fundamental legal errors as outlined in our brief, but I want to address three of those today. And they are, first, it ignored EDPA's mandate that it defer to the presumptively correct state court fact findings and instead replaced them all with its own. Two, it virtually eliminated Nepu's requirement that the prosecution know that a witness's testimony is false. And three, it radically altered Brady's suppression element when it found the prosecution essentially suppressed science. Now beginning with the first, when he raised, petitioner raised his Nepu and Brady claims in the state court, the state habeas court considered all of the evidence old and new and made something over 50 discreet and detailed findings of fact that thoroughly rebutted every element of the Nepu and Brady claim. The dispute that that deference, that deferential standard applies to the fact findings. Indeed, the lower court acknowledged that it's in 2254E1 that those presumptions apply. But the lower court, instead of beginning its analysis with those state court fact findings, it went directly to the underlying evidence and created a radically different view and interpretation of the factual record. And I'd like to provide one critical example, I think, and this applies to all of the elements, but this example is relates to materiality for Brady and Nepu. And critically, the relevant facts are antecedent to and they precede essentially the underlying ultimate legal measure of materiality. To begin, the state court looked at the non-DNA evidence at trial and it essentially weighed and described each witness, fact witness that was a non-DNA witness, what they said. They basically had a, it summarizes exactly what their testimony consisted of. And in doing that, the court actually, there are numerous inferences and fact findings, even in that step, because there's some dispute about what some of these witnesses actually said. And if the court starts there, they can essentially get to what those witnesses said. When these findings are made, the state habeas court, almost every time, has a direct citation to the record as well. When you say state habeas court, you're talking about the state trial court,  The state court, yes, that's correct. Because the appellate court didn't really do anything. So the appellate court dismissed the claims as an abuse of the writ. As a, not successive. Yeah, they used the term subsequent, that's correct. They did so, but as the court's precedent laid out in our briefing shows, the fact that the court ultimately didn't resolve the substance of those claims doesn't have an impact on whether the presumption applies. And again, the lower court essentially acknowledged that. So after the state court defined the witness testimony, it then measured and essentially created a And just to be clear, are you, are you saying that's not procedurally defaulted? These claims are procedurally defaulted. I'm sorry. Yes, Your Honor. The claims are defaulted and begin with that. The, but getting back to what the state court did, it essentially weighted measure and it assigned inculpatory value or weight to each of those non-fact witnesses. And overall, essentially saying that there was substantial evidence of guilt based only upon those fact witnesses. And it basically did the same thing with the DNA testimony of both the state and the defense. It defined what they said. And in particular, defining what the defense DNA experts said, because there's a dispute about whether the, this defense DNA expert actually engaged and essentially contradicted the state's DNA expert. When you look at the findings in the state court, it's very clear and it concludes that it did. The court then But do we, do we, do we owe deference when there's a procedural default and that's what the highest court ruled? I mean, do we look through to the state trial court anyway? Yes. In Murphy v. Davis, which is in the, in the, the court, this court in a way goes through those factors. And it, it, so to begin the, it doesn't matter if the ultimate court, in this case, the CCA, the Court of Criminal Appeals, it, it doesn't matter if they essentially make a decision that's not a legal decision that is relevant to habeas. So they can, the facts building into a decision, which might be that it's subsequent, that doesn't matter. And so long as the fact findings are But the fact finding has nothing to do with the finding that is subsequent. Well, there was another portion of the, of his state habeas, subsequent state habeas application. He filed what's called an 1107, I believe, 2, 3 writ. And this is essentially, Texas created a junk science writ, that all you really have to do is establish that there was a change in science that essentially affected evidence at trial. And this did. But at the end of the day, the court found it wasn't material. That, that's the other step in the statute, that if the science has changed, and it agreed it did, and if the outcome changed, and it agreed that the new test performed in 2017 gave a different result than the tested Counselor, let me back up a little bit. Sure. Your district court brief stated, and I'm quoting here, like the defendant in Strickler, where the Supreme Court determined that the state suppressed documents favorable to the accused for impeachment purposes, it appears that Herod can meet the first two Brady requirements and can therefore show cause why he did not raise the claim when he filed his first state applications. Now you're, you're maintaining that that language was not intended to conceive the suppression element, as I understand it. Yes. Is that correct? That's correct. Why would we treat this case any different from Strickler in light of the, what was in the brief? Because the, as we argued in our brief, and in our 28J letter, 2254A is the last backstop, and what it essentially says is before a federal court can grant habeas relief, it has to, as relevant here, ensure that there is a constitutional violation. And that is a jurisdictional element. The parties can't concede to that jurisdiction. The, we, essentially, we can't agree that an element of a four-part constitutional claim is not necessary to result. Well, let me ask you this. This is going to be my next question also. Is it a concession by the state? No, it is not. So how is it not a concession by the state? Because the, it was conditional. It said, it appears, this attorney, who is no longer... Well, the challenge is, you know, you sort of, to show cause to get beyond the procedural default. Right. These, these, the standard we used to do that really mirrors the standard of assessing a Brady violation. In other words, you've got suppression, and then you've got whether it's material under Brady. Well, I mean, it sure sounds like the state conceded not only the cause to excuse the default, but also the suppression element of Brady. I have two answers to that. One is that, as we cite in our brief, there was, I substituted in in this case shortly before this attorney retired. And in the, in the district court, there was an argument. Essentially, he wanted the parties to come and answer questions and discuss the standard. And as we outlined in our brief, at that hearing, we discussed largely the other claims. But when it came to cause and to the question of waiver, I was, I did the argument. And what I did is I clarified, and I think this is clear already in the briefing prior to my argument, we clarified that the cause concession only related to the evidence that was new. The, so for instance, we have a 2017 new DNA test. They also, the part of the state and the petitioner provided various expert affidavits and other material. And we made clear that, I made clear that that was what the cause concession related to. And as, in addition, I cited a case called the United States versus Higson. It's a Fourth Circuit case. In that hearing, and I also cited in the brief and explained what it says. And in almost every way, it resolves the Brady suppression, suppression issue against the petitioner. Counsel, let me ask you a question relative to the Teague Bar. I don't think on either side you all have expansively briefed the Teague Bar. But do Herod's claims, the Brady claims, require the court to break new constitutional ground if we conclude simply that Brady and its progeny that existed at the time doesn't require the relief that he seeks? No, Your Honor. The, essentially the, the question, can you repeat the question? I want to make sure I understand. Do Herod's Brady claims require the court to break new constitutional ground if we simply conclude that Brady, the Brady case law at the time, doesn't require the relief that he's seeking here? It does because if the court affirms the decision, for the Pooh claim, the, what that the lower court did is it, it eliminated the prosecutorial knowledge component. The effect of what the lower court did is it essentially took the, the testimony that it said was false during the, the trial. And in order to do that, it concluded that it was junk science. It was essentially, it was totally underlined. And it accused the state of suppressing that, and it also essentially said that the state, the prosecution team, had knowledge that this test, or the testimony based upon this test, was junk. It was improper science. And in order to do that, it, it, it acknowledges that the prosecution has, had no idea. And in fact, there's an affidavit in which the prosecution said, I had no idea that this debate was happening about this particular procedure. And the, the lower court also acknowledged that the witness, the testifying DNA witness for the state, the DPS person, that they didn't know either. They didn't know that their opinion, scientific opinion, was false, which presents a problem, right? How is a scientific opinion false? What the lower court then did is it moved essentially the knowledge of the supposed falsity of the testimony first to DPS as an organization, and ultimately to the state of Texas. And it, the argument was essentially that because the state must have known, I'm saying the state at the abstract level, because it must have known that there were problems with the procedures used to perform this test, that that was enough to qualify for prosecutorial knowledge. And what that effectively does is it creates a junk science ring. If you remove any possibility that the participants in the trial could ever be aware that this information was supposedly false, then you, you have, they've created a pathway, essentially. You just show that the science has changed. Didn't the state of Texas, I don't, I don't have the timelines in mind, they went back and reopened a whole bunch of cases, didn't they, because of the... Yes, they did. And, and reversed or vacated convictions in a lot of cases. And so the numbers, I tried to research this, it's not entirely clear how many, but yes, they, there was a... Why didn't this one, how was this one different from the... Because the DNA testimony was not material. If you look at the other inculpatory evidence that has nothing to do with the DNA, it is substantial. It is, as this is a state court fact-finding, it's substantial. And in that, in that sort of regard, the state court also, again, looked at the DNA testimony separately. It considered what they say, and it considered the arguments that the state and the defense made at closing argument. And it weighed all of those factors, and in the end... We've got that in the state court record. That is in, yes. That's the statute, the reopening DNA statute. That is in, that is in the record. The, the findings are at 4731, and there are many pages of it. But it examined the closing argument. At the end of the day, what it said was that the defense DNA expert essentially clashed directly with the state's DNA expert, and that defense counsel, during argument, won. You had the better argument. You essentially used both the state and the defense expert's testimony to minimize the effect of the DNA evidence. After all, the, even the state's expert consistently maintained that the, her opinion was that he could not be excluded from a particular set of alleles, could not be excluded, and that there was a 1 in 87 chance of randomly selecting somebody with that criteria. Defense counsel, in argument, you know, hit that out of the park. Essentially explained why that testimony is really nondiscriminate. It doesn't help the case, and... Well, but that's, that's a little different than, than evidence that, that excludes him from the DNA on the t-shirt, the blind... It is, it is, it is different. But how can you say that doesn't have a material effect on the jury? He was, his DNA was not on it. That's different than saying, well, there's a 1 in 87 chance that he is on it. There is a difference, but it's not a match. It's not a DNA match. It is a very low probability. I think we pointed in our briefing, there were millions of people that, if you selected at random in the country, that also had those, these are very common DNA alleles. What about the cell phone tower records, where it shows the phone went from Santa Fe, Texas, to Texas City... Right. ...during the hours that the, that the assault and the robbery took place? Is there, is that questionable in any way? I, I think they may question its, its effect on the jury, but yes, it, it definitely showed a pattern that matched the fact witness's testimony. That he left the area in which the petitioner lived and essentially moved to the area in which the home invasion occurred. That was covered at trial? That was... Yeah, that was, so that's another factor is that all of these issues really weren't before the jury. They were covered by trial. The, the, the inconsistencies and the conflicts in the evidence was all there and, and both there. But I guess I, I'm at my limit. I wanted to reserve the balance of my time. Thank you, counsel. Thank you. Good morning. I'm Jonathan Landers. I'm here representing the appellee, Mr. Harrod. May it please the court. The district court correctly decided that the false DNA evidence in this case and what the state of Texas did after they discovered the DNA, DNA evidence was false, resulted in an extreme malfunction of the state criminal justice system. Right off the bat, I'd like to say the district court clearly found a constitutional error, a due process violation. So 2254A is met. That jurisdictional hook is absolutely met. This case exemplifies the reason we still have federal habeas corpus. Federal habeas corpus is here because the federal courts have to guard the due process rights and the constitutional rights of our people and our citizens whenever the state courts let us down. Well, but the statute's very clear. We have to defer. We owe, we owe deference to the state habeas process. How much deference is afforded here? You heard counsel opposite say we still afford deference to that trial court's findings. So I think there's three things we need to remember and that's one of them in this case. Okay. One of the things we have to remember as we're looking through this case is that this is a procedurally defaulted claim. So very importantly, 2254D does not apply. That, that deference that most petitioners usually can't get over because it includes the idea that a state court ruling has to be an unreasonable application of clearly established Supreme Court precedent. Well, that's only true if the default was not an adequate. So you have to get over cause and prejudice clearly for the court and, and we'll discuss that more as we go forward. But if cause and prejudice is established, then D's out the window and this court is looking at whether or not there is a due process violation. Are you challenging any of the state court's findings? Yes. And I'm going to discuss that in just a minute as well, judge. Um, as far as 2254E1, the facts, whether or not the facts have to be rebutted by, uh, I think it's clear and convincing evidence. This court's precedent says it does apply. And I'll discuss that. I think we've made the argument. I understand that you're bound by other panel's decisions that under the YILST, we look back to the last reasoned decision. So maybe that is wrong, but for the purposes of today, it doesn't matter. We meet E1 just as the district court found multiple times. And I will discuss the facts in just a minute because really that's what changes this case from most of the cases that land before this court. Um, but briefly, a couple of other things that we need to remember before we jump into our analysis. Brady, the classic Brady, whether it's suppressed favorable evidence and NAPU, Giglio, we have false testimony. Those are due process claims. They all fall. And I think judge Engelhardt, you mentioned this. They all fall under the Brady analysis. If you read the Iger's case, the Supreme court case, it says Brady applies under three different situations. Talks about the undisclosed evidence type claim. It talks about the false statement type claim. If you read Giglio versus the United States, same thing. Due process is violated by the deliberate deception of the court where the government allows false evidence to go uncorrected or where there's suppression of favorable evidence. These are not different claims. And that's why they were raised under one due process heading in the brief. So the idea that we're not going to impute the state's knowledge to the prosecutor doesn't fly. In any case that the state cited, you said otherwise, was a 2254 D case, where we had to have a Supreme court case directly on point. Let me also point out in, uh, Giglio, the prosecutor was not aware of the false evidence. In the Hayes versus Brown case that we've cited, the witness wasn't aware that he was testifying falsely. And just for fun, I found this Burkehalter versus State case out of, um, Texas from 1973, where once again, the witness himself didn't know he was testifying falsely about a deal and the court pointed out that due process, perhaps the most fundamental concept in our law embodies principles of fairness. Briefly, the third thing, and I want to move on to this next, that we need to remember, and I'm not really sure if we're still contesting. It seems like sometimes, I know at some points the state has, I'm not sure if they are anymore. Counsel, let me see if we can put a little finer point on this. You argue that the state failed, as I understand it, the state failed to disclose scientific debate surrounding DNA mixture interpretation methods, if that's a fair way to state it. What precise evidence did they fail to disclose? Well, if we look at Ms. Browder's testimony at trial, that would be helpful. She specifically asked, are there difficulties with these statistics? She tells us no, but what we know, even from Andrew McWhorter's affidavit before the state courts, he's the DPS lead for the DNA section. He tells us that by 2011, DPS was already working to figure out how to implement SWIG damage. But wasn't that publicly known that there was some questions about the methodology being offered by the state? I would think that you possibly could find it, but the idea that it was publicly known seems to be rebutted by the fact the trial prosecutor didn't know about it, says so in his affidavit. He says, had he known about it and known DPS wasn't following them, he would have found a different lab. That's in his affidavit. Clearly the defense lawyers didn't know about it. And it also raises the question of why did DPS and why did the Texas Forensic Science Commission feel the need to write a letter to all members of the criminal justice prosecutors, defense judges, in 2015 to tell us about this? Well, that's another question. He got the right, he did get a chance to get a hearing, didn't he? Post, uh, no, not under the statute. I thought the state court made specific findings about the statute that allowed the new evidence. Never happened, Judge. So what, what happened here? Just so you know, I want to mention, you know, Claire Browder at trial, she's a hundred percent sure about her idea that Mr. Harrod cannot be excluded. I want to talk briefly. I thought the defense expert agreed basically with her analysis. The defense expert agreed that Harrod could not be excluded from the DNA trial. And again, these are experts giving opinions. How do you catapult that into falsity for the purposes of NEPU or, um, again, scientific debate, back to Judge Ingleheart's question, how does that become evidence that the state failed to produce? Well, so we have kind of a mixture of Brady and false evidence, more classic false evidence claim that we have from Claire Browder alone. She says that the lab is accredited, which means they're performing to the standards that have been set forth doing the procedures as they're supposed to be performed. Was that untrue at the time? That was untrue at the time. We know that there was just debate. No. Um, so, and I thought what she did was done pretty much across labs across the country. At that point, there wasn't there evidence of that also? There is. This was a common mistake, but this case, a common mistake. That's the thing. It's a mistake. Does that rise to the level of Brady? Yes. And here's why. And this is the third thing that we need to remember. This evidence was false and it's always been false. And we know that from Dr. Collins. We know it from Dr. Badoli, who's what recognized as probably the best in the nation at these mixture analysis. And here's what they tell us. Not only based on new techniques that use computers to do the analysis, is Herod excluded? Not only is he excluded, had the CPI technique, the one that was around in 2011 and 12, not only had that been done correctly and there was three contributors, ideally. So every time an expert makes a mistake like this, we're going to have cases come up on Brady and Nepute? I think this mistake is rather rare. And I'd like to point out also, not only that, but the way it was done wrongly, where we look at the known samples before we get to the analysis. It may be rather rare, but experts opining on things that turn out to be contested or wrong is not rare. Contested, you're correct. And I'd also like to put out for Judge Richmond. I don't think there's been another DNA case in the nation where the DNA evidence was false. Some of the cases cited by the state, I think it was a fifth circuit case. I've got the names here. Some of those cases say, well, look, there's disputed opinions. There's a disputed opinion about hair, hair follicles and this type of stuff. But none of those cases, none of them, not one involves DNA evidence or forensic type evidence that that was false. Well, I'm not sure that's right. Okay. Because there, I thought there was a lot of habeas litigation after, especially out of Harris County, if you'll recall that. That's the crime lab issue. So that was a bit of a different issue. There was a man, I think it's Salvador, who was I think stealing drugs and faking drug tests at the Harris County crime lab. And so we have a kind of a doctrine in Texas that says if there's a person involved in your case, it could be a detective, it could be an analyst. And we have found that they've done something just so completely wrong and violated due process, then you can get a presumption moving forward. So there's been a number of cases for that. But I thought even in DNA cases, generally, even when it comes to life that the DNA evidence was mishandled, retested, it's different. Isn't there still a prejudice problem to this that yes, the DNA evidence would have been different at trial, but it would not have made a difference. Isn't that where we are in this case? Well, previously, before this court, that was the issue. Was there prejudice? Was there materiality? That apparently has changed now that relief has been granted, but that is what the state was arguing below. And the district court did a very good job of going through the evidence at trial and the problems with that evidence. You have Ms. Gallagher, her statement. What's the problem with the cell tower evidence? The problem with the cell tower evidence is number one, it doesn't show who had the phone. And number two, it doesn't put him at Mr. Harrod at the scene of the crime. The only thing that puts him at the scene of the crime is the DNA evidence. That's the only physical evidence. I thought his girlfriend put him at the scene of the crime. I thought the husband put him at the scene of the crime. So we have a few things there. Mr. Gallagher, story changed numerous times throughout this proceeding. I don't know that he's that believable of a guy. But the jury, that's for the jury, is it not? Well, it was for the jury. And the jury heard all of that, did they not? They did. And the jury deliberated from about noon until they had to go home for the day on the last day of trial and had to come back the next morning. The jury was asking, sending jury notes about Alyssa Gallagher's testimony, because as you'll recall, she admitted to lying. We're talking about Mr. Gallagher. OK, for Mr. Gallagher. He's a convicted sex offender. He's on probation for drugs. He does not say who came into his house the night that it happens. OK, he doesn't mention it until the next day. But he says, well, I was worried about retaliation until I found out he sexually assaulted my wife. He does. And he also says that, you know, he has a prescription for the codeine that he bought on the night in question. So I do think there's some questionable parts of his testimony. Well, I'm sorry. Go ahead. It seems like we're getting back into the details of the case. Particular things that the jury heard. I'm going to ask you a couple of questions about the Teague bar, which you haven't mentioned yet. And I asked your counsel opposite about you. You're asking us to conclude that the government waived its Teague arguments by failing to raise them for the district court, as I understand it. But we can't deem Teague waived absent compelling reasons. You're familiar with Jackson versus Johnson. What are the compelling reasons here that for us to not assess Teague? I don't think you have to not assess Teague for Mr. Harrod to affirm the district court's decision. I just want to be clear on that. There is no Teague bar here. And I'll point out that there's a case from 1948 cited in our briefing. Let's see here. Townsend versus Burke. It's a due process case cited in our brief. There, the trial court relied on false evidence. The guy in sentencing a defendant. He hadn't been convicted of some crimes. The trial court suggested he was. Now, he didn't have a lawyer either. But when he was sentenced, the trial court relied on that evidence. And the Supreme Court told us this prisoner was sentenced on the basis of an assumption concerning his criminal record, which were materially untrue. Such a result, whether caused by the carelessness or design, is inconsistent with due process and cannot stand. So we've got almost 80 years ago where false evidence, whether or not it was by design or carelessness, resulted in a new trial. So to answer the Teague question, Teague prevents the court on habeas from making new laws, I guess, procedural laws of constitutional law, right? I mean, that's what it is. There's nothing new about this. We are asking you to apply the due process framework that came from that Townsend case through Brady, through Maffu, through Giglio. We're not asking for anything new. So I do think the argument was weighed. But I think you can- Where's your Brady case that is most similar to this one? Once again, the Brady and the false evidence claims are pretty close, but some of them are cited in the brief. There's the Clements versus the Madden case, where the witness received parole consideration, but it took place after the trial. And- Well, I'm talking about where's your Brady case that involves a scientific debate or debatable processes, methods that the prosecutors didn't know about, that the expert may have overstated or something like that. I mean, basically, where's your best case that shows Brady being applied in a case like this one? I'm going to be honest with you. I think that the facts of this case are so rare. Then how in the world are we not extending constitutional law to apply Brady to them? Well, first of all, 2254D does not apply. So we don't have to have a Supreme Court case directly on point. We don't have to have that. What I'm asking you to do and what the district court did is apply the already in place Brady framework to the facts of this case. Yes, but we would have to be extending Brady. There's no evidence that the state suppressed or withheld. It's all about this scientific debate. And the expert used the wrong methodology, as it turned out. There is evidence that the state suppressed and withheld specifically the issues, the known issues by DPS at the time of trial, at the time of the testing, that there were problems with the CPI technique that was suppressed. But if that's publicly available and the expert, the DNA community knew that there was debate going on, how is that suppressed? Well, it's just like in Strickler versus Green, where you have a witness and they talk about how had the defense just read these news articles, they could have found out about other statements. But we're told the rule is not that the prosecution can hide and the defense must seek. We're not looking at defense counsel here. It's not an ineffective assistance of counsel claim. This is a claim where we look at the state and see the prosecution and the prosecution team and see if they withheld evidence. What about on the Naipoo violation? The new or should have known issue is is largely debated even today. Isn't that correct? I don't know that it's so debated. The case cited by the by the appellant here, if I could find it, is actually a 2254 D1 case where they said the Supreme Court's never decided this. But they also dropped a footnote and said, but two other circuit courts have decided that the way that we're suggesting we or any of the controlling Texas courts taken up the issue. You guys have just cited the the new or should have known language before I've cited that in my brief. And I mean, at the time that that this came up is obviously that it was all before 2011. But I don't know that you had the opportunity to apply it. Once again, that language is somewhat it's inconsistent with Naipoo and what it requires for this should have known to be engrafted upon it. Well, it's just like the Townsend case I just discussed, where they they basically say, look, it's the falsity of the evidence. It's not what we don't know that the trial judge knew it was wrong. In that case, they didn't know if the prosecutor had. But I thought Naipoo was basically the prosecution knowingly adducing false evidence and letting it stand and proceeding anyway without disclosing it. How is the should have known even consistent with the underlying facts of that case? No, that's where the language came from. But then you have Giglio, where the trial prosecutor didn't know about the falsity, right? And it was imputed to him. He had no idea that this witness testifying had a deal. I mean, so there's cases there. But other people with the state did. Other people with the state did. And what I'm arguing, other than the false evidence. Here, what the district court talked about was that the prosecutor should have known that what this expert was testifying to was contested or wrong. I disagree. I think he said the prosecution knew or should have known. The prosecution knew or should have known. And Claire Browder, who's an expert for the state, certainly should have known that she applied the science wrong. She did. She testified. She did not. She was a bad expert. But the defense expert also agreed with her methodology. Well, when you have an expert on Bigfoot, a lot of times you're not going to get the best outcome. That surely wasn't. I wasn't going to bring that up. But once again, we're not here on a due process claim. We are not here to discuss ineffectiveness. We've got plenty of ineffectiveness claims left for the district court to take up. So you're arguing that this witness gave false testimony that was material. Hypothetically, maybe not hypothetically, could this witness be prosecuted for perjury based on what happened in this trial? We we've never had a hearing. And I wanted to make that clear. Judge Richman, this has never been flushed out exactly what happened here. Well, I'm asking you, I mean, does it meet the same criteria? Do you believe that this witness was a bad expert herself? If we had a hearing and she said that she knew that she compared these, she looked at the knowns before she compared the samples, then it probably could. But right now, I don't think. But that's new testimony. I think Judge Ingleheart's question is based on the testimony we have in the record, could she be prosecuted? And we've asked for a record, a hearing multiple times. But based on what we know right now, I don't think we know that she subjectively knew she was lying. All of that aside, it seemed to me like the state habeas court assumed that the DNA evidence was was bad and that it should have been and it had new. What would the trial look like if the new evidence were presented? The state habeas court actually found that the evidence was not false. But I thought it also looked at hypothetically, even had that new DNA evidence been introduced at trial. They also, that was where the state habeas court falsely found that Herod had an expert that disputed the cannot be excluded language. That was also false. I mean, I mean, the state habeas court. I thought the state habeas court, let me finish my question, said that even assuming that the new evidence was presented to the jury and had that was what the jury had instead of the one out of 87, that the evidence of guilt was substantial, that it was not prejudicial. So did the state court make that finding? You are correct that there was a materiality finding, that materiality would be a question of law. And if prejudice, prejudice, prejudice and materiality are essentially the same. On the likelihood that the outcome of the trial would have been different. Right. Under Brady, I think we usually call it materiality. But yes, they made that legal finding. But if cause and prejudice standard is met here, the legal findings aren't entitled to any deference whatsoever. Well, we look at it. Right. There were substantial other evidence of guilt. Now, what do we do with that? And I'm out of time, but I want to answer your question first. I want an answer to that. Every single other witness and all of the other evidence was impeached, was discredited in some way or another. It's laid out in my briefing. It's very precisely laid out in the district court's opinion. The only unimpeached evidence, the only physical evidence tying Richard Herod to the scene is the DNA evidence and the idea that he could not be excluded. And sometimes it was even said he was included in that evidence. That is the issue here. The question is, it's not by preponderance of the evidence. We don't have to prove it by a preponderance. Is there a reasonable probability that the outcome of the trial would have been different had the jury learned that he was excluded from all DNA evidence at the scene? And we argue we can meet that burden. OK. I just want to make sure we all agree on what the question is. Sure. OK. Thank you very much for your time.  Tony Lamb. OK. I want to make a couple of points with respect to the falsity of this testimony. What the lower court did is it essentially interpreted expert affidavits that were presented post post-trial, presented to the state habeas court. And it interpreted these opinions that were attacking the trial testimony and essentially created a fact. It had to have some way, the lower court now, that existed at trial, some fact that existed at trial in which to determine or to say that the testimony was false. And the only evidence, the only way that was done was to convert these expert opinions into a fact, a fact that is essentially a due process fact. And then it accused the prosecution of suppressing that fact. But the state court took a different tact. And there is a lot of evidence that I think supports the state court's findings of fact in relation to this debate. And it's very clear that in 2010, the Swigdam report, it's in the record, identified all of the problems that they're concerned with. And that commission was, I think it's the National Institute of Science, its mission was to educate forensic practitioners about all of this. And that was known, that was available to everybody. So on the suppression front, you have evidence that didn't exist, opinions that were retroactively turned into facts that didn't exist, nothing the prosecution could suppress. And essentially, that's it. That's the whole category. This court's clear precedent, it says that that's not enough. In particular, the using an expert, a post-conviction expert, to find a testifying DNA expert's testimony was false. That's just another argument. It's not a fact. It doesn't turn that into a fact. And the state court fact findings, I think, very clearly run on that. My only other minor point is that when we go to the district court interpretation of the record, there are two kinds of evidence here. There's evidence that the jury conflicts or impeachment in evidence that the jury heard, the jury heard on. And I want to point out essentially what the, a place where the district court, I think, shows what it's doing with respect to the presumption. And it's ROA 972. And essentially what it says is it reweighed all of the expert affidavits in a way that was completely contrary to the state court. And it said that that's why this evidence was false. What it says here is that this reweighing is clear and convincing evidence to overcome the presumption. So to be clear, it jettisoned the presumption, redid all of the factual findings, and then used its rationale to overcome the presumption, which this court's precedent says you can't. You can't just disagree. And I think that there's one other spot in the memorandum of opinion from the district court where it does the same thing. Let's assume that, Brady aside, there's evidence in the scientific community now, the state of Texas now says, we agree, he's excluded. That's a fact. So from a due process standpoint, where does that leave us? So a couple of things. The state previous trial court looked at the evidence and said the scientific evolution happened after this trial. The DPS essentially was aware of it. In a lot of cases, you would get a new trial based on it. If you can show materiality. And isn't that where we are? It is. And although the state habeas court made that decision with respect to a statutory standard for the junk science writ in Texas, there are countless facts that it makes before that that lead directly to the materiality when you get to the ultimate measure. And we contend that that's what the district court should have started with. The one other thing is that the arguments here, the efforts of buttress, what the district court did, we're not starting from the state court fact find. It's to buttress his view of the record that he presented below and here was rejected by the state habeas court completely. And he then returned to the federal court and essentially got the judge to agree that with his view of the record without ever mentioning the great majority of the findings. I see that I'm almost out of time. If there are more questions, I can, if not, then we ask that this court reverse the district court's grant of relief on both of those claims. Thank you.